**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Ammar Dean Halloum,                    )   No. CV 11-0097-PHX-RCB
                                       )
      Plaintiff,                    )   **O R D E R**
                                       )
  vs.                                  )
                                       )
Charles Ryan, et al.                   )
                                       )
      Defendants.                   )
                                       )
_____)

     In January 2011, Plaintiff Ammar Dean Halloum filed this civil rights action under 42 U.S.C. § 1983 against various Arizona Department of Corrections (ADC) employees (Doc. 1).  In 2012, the parties filed and briefed cross-motions for summary judgment (Docs. 52, 55).  On November 28, 2012, before ruling on the motions, the Court dismissed the action without prejudice under Federal Rule of Civil Procedure 41(b) due to Plaintiff's failure to pay the civil filing fee after his release from custody and failure to respond to an Order to Show Cause directing him explain why he was unable to pay (Doc. 74).[1]  Accordingly, the summary judgment motions were denied as moot (id.).

     Two months later, in January 2013, Plaintiff filed motions indicating that he did not have notice of the Order to Show Cause or the Order dismissing the action (Docs. 76-77).  On April 25, 2013, the Court vacated the judgment entered on November 28, 2012 and the

_____

[1]The Court had granted Plaintiff *in forma pauperis* status, and he was required to pay the unpaid balance of the filing fee within 120 days of his release (Doc. 5).  Plaintiff was released from custody in April 2011 (Doc. 16).

1  Order entered that same date (Doc. 81 at 8).  The April 25, 2013 Order stated that the parties'
2  summary judgment motions will once again be pending (id.).  Thereafter, Plaintiff paid the
3  filing fee in full (Doc. 83).

4      Pursuant to the Court's April 25, 2013 Order, the parties' cross-motions for summary
5  judgment are again before the Court (Docs. 52, 55).

6      Defendants' motion will be granted in part and denied in part, and Plaintiff's motion
7  will be denied.

8  **I.      Background**

9      From December 2009 to July 8, 2010, Plaintiff was confined at the Arizona State
10 Prison Complex (ASPC)-Florence North Unit, and thereafter he was confined at ASPC-
11 Tucson, Whetstone Unit (Doc. 1 at 3, 5B).  In his Complaint, Plaintiff named the following
12 Defendants: (1) librarian Kerry Hernandez; (2) WIPP Coordinator Denise Huggins;[2]
13 (3) Correctional Officer (CO) III Tara Turner; (4) Master Chaplain Bruce Brier; and
14 (5) Lieutenant Debra Riharb (id. at 2A).[3]

15     Plaintiff alleges numerous First Amendment violations, some of which relate to his
16 status as a Muslim of Syrian origin (id. at 3).  In Count I, Plaintiff set forth retaliation claims
17 against Hernandez, Huggins, and Turner (id. at 3).  In Count III, Plaintiff alleged that Brier
18 denied Plaintiff a religious shaving waiver in violation of Plaintiff's right to free exercise and
19 to equal protection (id. at 5).  Count IV alleged that Brier refused to distribute copies of the
20 Quran, also in violation of Plaintiff's right to free exercise and to equal protection (id. at 5A).

21     Finally, in Count VI, Plaintiff alleged that Riharb, in violation of Plaintiff's free-
22 exercise rights, prohibited Plaintiff and other Muslim inmates from holding communal prayer
23 when she refused to let them bring in their prayers rugs for pre-breakfast prayers during

24

25

26     [2]WIPP refers to the Work Incentive Pay Plan.

27     [3]On screening, the Court dismissed the ADC, Ryan, Clark, Canteen Inc., Coleman,
28 Sauceda and Jackson as Defendants (Docs. 5, 31).  The Court subsequently dismissed
   Itenberg as a Defendant (Doc. 40).

1   Ramadan (id. at 5C).[4]  Plaintiff sued for money damages (id. at 6).

2   Defendants move for summary judgment on the grounds that (1) there is no evidence

3   of retaliation by Hernandez, Huggins, or Turner; (2) Brier properly handled Plaintiff's

4   shaving waiver request and Plaintiff's religious practice was not burdened; (3) the return of

5   copies of the Quran was facilitated by an official other than Brier and was pursuant to ADC

6   policy; (4) there is no evidence that Brier acted intentionally to discriminate against Plaintiff;

7   (5) Riharb did not burden Plaintiff's religious practice; and (6) Defendants are entitled to

8   qualified immunity (Doc. 52).[5]

9   Plaintiff opposes Defendants' motion and cross-moves for summary judgment,

10  arguing that (1) Hernandez, Huggins, and Turner's actions constitute unlawful retaliation;

11  (2) Brier denied Plaintiff and other Muslims shaving waivers but permitted inmates of other

12  religions to keep beards; (3) Brier customarily accepted boxes of language books and Bibles

13  but refused copies of the Quran; (4) Riharb denied Muslims the ability to pray when she

14  refused to let them use prayer rugs; and (5) Defendants are not entitled to qualified immunity

15  (Doc. 55).[6]

16  **II.    Summary Judgment Standard**

17  A court must grant summary judgment "if the movant shows that there is no genuine

18  dispute as to any material fact and the movant is entitled to judgment as a matter of law."

19  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The

20  movant bears the initial responsibility of presenting the basis for its motion and identifying

21  _____

22  [4]The Court dismissed Counts II and VIII as barred by Heck v. Humphrey, 512 U.S.
23  477 (1994) (Doc. 5).  The Court later dismissed Counts V and VII on Defendants' Motion
    to Dismiss (Doc. 36).

24  [5]Defendants also argue for summary judgment as to any monetary claims against
25  Defendants in their official-capacity (Doc. 52 at 22); however, Plaintiff did not assert any
    official-capacity claims against Defendants.
26

27  [6]Before he filed his response, the Court issued an Order with the Notice required
    under Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1988) (en banc), which informed
28  Plaintiff of the requirements of Federal Rule of Civil Procedure 56 and the Local Rules of
    Procedure governing summary judgment (Doc. 51).

1  those portions of the record, together with affidavits, that it believes demonstrate the absence

2  of a genuine issue of material fact. Celotex, 477 U.S. at 323.

3      If the movant fails to carry its initial burden of production, the nonmovant need not

4  produce anything. Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc., 210 F.3d 1099,

5  1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden then

6  shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

7  contention is material, i.e., a fact that might affect the outcome of the suit under the

8  governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury

9  could return a verdict for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

10  248, 250 (1986); see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir.

11  1995). The nonmovant need not establish a material issue of fact conclusively in its favor,

12  First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); however, it must

13  "come forward with specific facts showing that there is a genuine issue for trial." Matsushita

14  Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation

15  omitted); see Fed. R. Civ. P. 56(c)(1).

16      At summary judgment, the judge's function is not to weigh the evidence and

17  determine the truth but to determine whether there is a genuine issue for trial. Anderson, 477

18  U.S. at 249. In its analysis, the court must believe the nonmovant's evidence, and draw all

19  inferences in the nonmovant's favor. Id. at 255. The court need consider only the cited

20  materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

21  **III.   Count I-Retaliation**

22      **A.   Governing Standard**

23      Prisoners have a First Amendment right to file grievances and pursue civil rights

24  actions. Rhodes v. Robinson, 408 F.3d 559, 567 (9th Cir. 2005) (quoting Bruce v. Ylst, 351

25  F.3d 1283, 1288 (9th Cir. 2003), and Schroeder v. McDonald, 55 F.3d 454, 461 (9th Cir.

26  1995)); see also Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir. 1995) (prisoners have a

27  constitutional right to meaningful access to the courts, and prison authorities may not

28  penalize or retaliate against an inmate for exercising that right), overruled on other grounds

by Shaw v. Murphy, 532 U.S. 223 (2001).  Thus, allegations of retaliation against an inmate's First Amendment rights to speech or to petition the government may support a civil rights claim.  See Rizzo v. Dawson, 778 F.2d 527, 531-32 (9th Cir. 1985); Valandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989); see also Pratt v. Rowland, 65 F.3d 802, 806 & n. 4, 807 (9th Cir. 1995) (retaliation claims "fall within the 'other protection[s] from arbitrary state action' . . . because they are based upon protection of the prisoner's First Amendment rights, and not their Due Process rights").

"[A] viable claim of First Amendment retaliation entails five basic elements: (1) [a]n assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes, 408 F.3d at 567-68.  A prisoner "must allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals, such as preserving institutional order and discipline."  Barnett v. Centoni, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam).  A variety of conduct can be actionable as retaliatory if undertaken for an improper purpose.  See, e.g., Rizzo, 778 F.2d at 531-32.  And the resulting injury need not be tangible to support the claim.  Hines v. Gomez, 108 F.3d 265, 267, 269 (9th Cir. 1997) (an injury asserted to be the chilling effect of an officer's false accusation on the prisoner's First Amendment right to file prison grievances is sufficient to support a retaliation claim).

Retaliation claims must be evaluated in light of the concerns of excessive judicial involvement in day-to-day prison management, and courts must therefore "afford appropriate deference and flexibility" to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory.  Pratt, 65 F.3d at 807.

## B. Facts

In support of their motion, Defendants submit a separate Statement of Facts (DSOF), which is supported by Defendants' and other prison officials' declarations, various attachments, and an excerpt from Plaintiff's deposition (Doc. 53, Exs. A-M).  Plaintiff

1   supports his motion/response with his own declaration, sworn statements from numerous

2   other individuals incarcerated at the same time as Plaintiff, and exhibits (Doc. 55, Exs. 1-

3   11).[7]

4          The parties set forth the following relevant disputed and undisputed facts:

5          On March 12, 2001, Plaintiff brought an affidavit to Hernandez for notarization, but

6   she refused to notarize it (Doc. 1 at 3; DSOF ¶ 17). Defendants state that she would not

7   notarize it because the notary statement on the document was worded improperly, so

8   Hernandez instructed Plaintiff to correct the wording (DSOF ¶ 17). Plaintiff states that

9   Hernandez read the affidavit, made racist comments to him, and refused to notarize the

10  document (Doc. 1 at 3; Doc. 55, Ex. 1, Pl. Decl. ¶ 5 (Doc. 55 at 21)[8]). Defendants state that

11  at no time did Hernandez make racists comments to Plaintiff (DSOF ¶ 25). Plaintiff states

12  that he complained to the Sergeant on duty about Hernandez's conduct (Doc. 1 at 3).

13  Plaintiff states that the Sergeant reviewed the affidavit and exonerated Plaintiff (id.).

14

15  [7]Defendants object to Plaintiff's separate Statement of Facts on the ground that it is
    just an index of his exhibits and does not set out factual assertions as required under Local
16  Rule of Civil Procedure 56.1 (Doc. 71 at 1-2). The Court finds that Plaintiff's
    motion/response memorandum, declaration, and verified Complaint set out Plaintiff's factual
17  assertions and establish disputes with DSOF. See Jones v. Blanas, 393 F.3d 918, 923 (9th
    Cir. 2004) (allegations in a pro se plaintiff's verified pleadings must be considered as
18  evidence in opposition to summary judgment). In light of Plaintiff's pro se status and the
    requirement to construe his pleadings liberally and afford him the benefit of any doubt, the
19  Court will overrule Defendants' objection. See Thomas v. Ponder, 611 F.3d 1144, 1150 (9th
    Cir. 2010) (cautioning district courts to "construe liberally motions papers and pleadings filed
20  by pro se inmates and . . . avoid applying summary judgment rules strictly"); Karim-Panahi
    v. L.A. Police Dep't, 839 F.2d 621, 623 (9th Cir. 1988).
21

22

23  [8]Defendants object to ¶ 5 of Plaintiff's declaration on the grounds that it lacks
    foundation and is not supported by admissible evidence (Doc. 71 at 8). The objection is
24  overruled. Foundation goes towards the admissibility of evidence, and Plaintiff has personal
    knowledge to testify as to what Hernandez said to him. See Fed. R. Civ. P. 56(c)(4); Latman
25  v. Burdette, 366 F.3d 774, 787 (9th Cir. 2004) (personal knowledge means that the witness
    actually perceived or observed what he testifies to). To the extent that Defendants' objection
26  goes to form, the Court finds that Plaintiff's declaratory statement is proper and admissible;
    regardless, Plaintiff is not required to present evidence in a form that would be admissible
27  at trial, as long as he meets the requirement of Rule 56. Block v. City of L.A., 253 F.3d 410,
    419 (9th Cir. 2001).
28

Defendants state that when presented with the affidavit containing improper wording, Hernandez asked Plaintiff if he printed it on the computers in the Education Classroom where he worked because she thought it looked recently printed and did not appear to have been in an envelope (DSOF ¶ 18). Plaintiff states that the affidavit was mailed to him by a paralegal agency (Doc. 55, Ex. 1, Pl. Decl. ¶ 9[9]). Defendants state that Hernandez then checked with James Ard, the Program Teacher, who confirmed that Plaintiff had access to a computer and printer (DSOF ¶ 19). Defendants state that Ard suspected Plaintiff had printed the document in the classroom (id.). Defendants state that Hernandez spoke with a Security Sergeant (DSOF ¶ 20).[10]

Plaintiff states that in retaliation for his complaint to the Sergeant, Hernandez attempted to get him terminated from his Teaching Aid job by going to Plaintiff's supervisor, Ard, but Ard confirmed that Plaintiff did not have access to the printer (Doc. 1 at 3).

Defendants state that Hernandez then advised Huggins that she believed Plaintiff used the education computers for personal legal work (DSOF ¶ 22). Defendants state that Huggins spoke with Ard, who advised her that he believed Plaintiff used the education computers for personal legal work (id. ¶ 23). Defendants further state that Ard requested that Plaintiff be reassigned from his position as a Teaching Aid (id.). Plaintiff states that Ard sought to keep Plaintiff in his position as a Teaching Aid (Doc. 1 at 3A).

On March 16, 2010, Huggins terminated Plaintiff from his Teaching Aid position on the ground that he used the education computers for personal work (DSOF ¶ 26). Plaintiff states Huggins terminated him based on Hernandez's false accusation (Doc. 1 at 3A). Plaintiff states that Huggins thereafter assigned Plaintiff to manual labor jobs, despite Plaintiff's disability, for the purpose of degrading Plaintiff and deterring him from

---

[9]Defendants' objection to ¶ 9 of Plaintiff's declaration is overruled (Doc. 71 at 9). Plaintiff has personal knowledge of the fact that he testifies to, and Defendants also assert that Plaintiff informed Hernandez that he received the affidavit from California (see DSOF ¶ 18). Fed. R. Civ. P. 56(c)(4); see n. 8.

[10]Neither Plaintiff nor Hernandez identify the Security Sergeant involved (Doc. 1 at 3; Doc. 53, Ex. B, Hernandez Decl. ¶ 9).

complaining (id.).  Defendants state that Huggins spoke with medical staff and was told that Plaintiff had no physical restrictions, so, in April 2010, Plaintiff was reassigned to a kitchen-helper position (DSOF ¶¶ 31-32).  Plaintiff states that on the second day of his kitchen job, he was injured as a result of his disability, and he was released from the kitchen job (Doc. 55, Ex. 1, Pl. Decl. ¶ 15[11]).

Plaintiff states that in early May 2010, he complained to CO IV Perry about Huggins' vindictiveness towards him (Doc. 55, Ex. 1, Pl. Decl. ¶ 17[12]).  Plaintiff states that he also complained to Turner about the unfair treatment from Huggins, but Turner refused to assist him (Doc. 1 at 3A).  Plaintiff states that he filed grievances, but Turner threatened to move Plaintiff off the yard (id.).  Plaintiff states that on May 19, Turner told another inmate that she knew Plaintiff had made a complaint against her and she went to Huggins to ask that Plaintiff be moved off the yard, so he would be moved to Yard 2 that afternoon (Doc. 55, Ex. 2, Saifullah Shahid Decl. ¶ 19 (Doc. 55 at 31)[13]).

Defendants state that on May 13, 2010, Plaintiff was reassigned to a groundskeeper position and moved from North Unit Yard 1 to Yard 2 (DSOF ¶ 34).  They also state that while Turner was Plaintiff's counselor, he went into her office daily to complain about issues, so it was agreed that Plaintiff would have to address his issues through inmate letters and could go to Turner's office only twice a week (id. ¶ 36).

Plaintiff states that there was no agreement for him go to Turner's office twice a week (Doc. 55, Ex. 1, Pl. Decl. ¶ 24[14]).  Plaintiff states that on one occasion, Turner allowed other

---

[11]Defendants' objection to ¶ 15 of Plaintiff's declaration is overruled.  See n. 8.

[12]Defendants' objection to ¶ 17 of Plaintiff's declaration is overruled.  See n. 8.

[13]Defendants object to ¶ 19 of Shahid's declaration on the ground that it contains hearsay (Doc. 71 at 4).  The objection is overruled.  Turner's statement to Shahid constitutes an admission by a party-opponent and therefore falls outside the hearsay definition.  Fed. R. Evid. 801(d)(2).

[14]Defendants object to ¶ 24 of Plaintiff's declaration on the ground that it is unsupported and consists solely of argument (Doc. 71 at 10).  The objection is overruled.  Plaintiff has personal knowledge to testify that he was unaware of a twice-a-week visit

inmates in before seeing Plaintiff, and when she finally saw Plaintiff, she screamed at him and told him she didn't want to see him and kicked Plaintiff out (id. ¶ 22).  Plaintiff states that he then went to the Administrative office and filed a complaint about Turner's behavior (id. ¶ 23[15]).

Defendants state that after a couple more job changes and a move back to Yard 1, Plaintiff was transferred to the Florence East Unit on July 8, 2010 (DSOF ¶¶ 41-43). Plaintiff states this was a retaliatory transfer because Florence East houses aggressive and dangerous inmates (Doc. 1 at 3B).  Plaintiff states that when he arrived at Florence East, he was hired to work again as a Teaching Aid after Supervisor Skelly verified with Ard that the earlier accusation about Plaintiff was false (id.).  Plaintiff states that two weeks later, Huggins called another WIPP Coordinator, Emilio Sauceda, and had Plaintiff terminated from his Teaching Aid job at Florence East (id.).  Defendants state that in July 2010, Huggins contacted WIPP coordinator Sauceda at Florence East and advised him to review Plaintiff's AIMS for comments about Plaintiff's job assignments (DSOF ¶ 46).  Defendants state that Huggins did not advise Sauceda to terminate Plaintiff (id. ¶ 48).

On July 26, 2010, Plaintiff was removed from his Teaching Aid position because AIMS revealed that in March 2010 he was removed from the same position for use of education computers for personal work (id. ¶ 47).

On August 8, 2010, Plaintiff was transferred to the Tucson Complex, where he immediately began a job as a Teaching Aide, which he kept for eight months until his release in April 2011 (Doc. 55, Pl. Decl. ¶ 39[16]).

---

agreement; thus, his statement is not solely argument.

[15]Defendants' objections to ¶¶ 22 and 24 of Plaintiff's declaration are overruled (Doc. 71 at 10).  Plaintiff has personal knowledge to testify as to what Turner told him, the actions of Turner that he observed, and what he did.  See Latman, 366 F.3d at 787.

[16]Defendants object to ¶ 39 of Plaintiff's declaration on the grounds that it lacks foundation, is not supported by evidence, and is not relevant (Doc. 71 at 12).  The objection is overruled.  Plaintiff has personal knowledge as to his transfer and the job he held, and the Court finds that it may be relevant that Plaintiff was given a job for eight months which

1

2

**C.    Analysis**

**1. Hernandez**

Plaintiff must first show that he exercised protected conduct.  Rhodes, 408 F.3d at 567.  He  states that he complained to the Sergeant about Hernandez's racist comment and the Sergeant took the issue seriously, which in turn began a series of retaliatory actions that, according to Plaintiff, were designed to deter him from filing grievances (Doc. 55 at 10). Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff's verbal complaint to a Sergeant about Hernandez's conduct constitutes a protected action under the First Amendment  Rizzo, 778 F.2d at 531-32; Valandingham, 866 F.2d at 1138.

Next, Plaintiff must demonstrate that Hernandez took an adverse action against him. Rhodes, 408 F.3d at 567-68; see Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988) (the plaintiff must identify specific facts as to each individual defendant's acts or omissions that allegedly caused the deprivation).  The alleged adverse action by Hernandez is her attempt to get Plaintiff fired by making a false accusation—that he improperly used the school's printer—to Plaintiff's work supervisor and the WIPP Coordinator (see Doc. 1 at 3; Doc. 55 at 2).  The Court finds that Plaintiff has sufficiently alleged an adverse action to support his retaliation claim.  See Austin v. Terhune, 367 F.3d 1167, 1171 (9th Cir. 2004) (the defendant filed false report that resulted in inmate's placement in segregation in retaliation for filing grievances).

Under the third element of the Rhodes analysis, Plaintiff must show that his protected conduct was "the substantial or motivating factor" behind Hernandez's action.  Brodheim v. Cry, 584 F.3d 1262, 1271 (9th Cir. 2009) (citing Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989)).  To make this showing, Plaintiff must demonstrate that Hernandez knew of the protected conduct and that either (1) there was proximity in time between the protected conduct and the allegedly retaliatory action, (2) that Hernandez expressed opposition to the speech, or (3) Hernandez's proffered reason for the adverse action was pretextual.  Corales v. Bennett, 567 F.3d 554, 568 (9th Cir. 2009) (citation and

28

———————————

Defendants claim Plaintiff was not previously eligible to hold.

emphasis omitted); see Pratt, 65 F.3d at 808 (timing can be considered as circumstantial evidence of retaliatory event).

Plaintiff asserts that after he complained to the Sergeant, the Sergeant privately spoke to Hernandez (Doc. 55 at 10). In her declaration, Hernandez confirms that she spoke with a Security Sergeant (Doc. 53, Ex. B, Hernandez Decl. ¶ 9). Although Hernandez's declaration statements suggest that her contact with the Sergeant occurred after she went to Plaintiff's work supervisor, the order of events is not clear, and, regardless, the Court must take as true Plaintiff's allegation that Hernandez's actions followed Plaintiff's complaint about her to the Sergeant. Thus, there is a material question of fact whether Hernandez knew of Plaintiff's protected conduct after the Sergeant spoke with her.

Ard avers that Hernandez came to speak with him on or about March 12, 2010 (Doc. 53, Ex. G, Ard Decl. ¶ 5), and Huggins states that Hernandez spoke to her just prior to March 16, 2010 (id., Ex. C, Huggins Decl. ¶ 8). This evidence supports that there was proximity in time between Plaintiff's protected conduct and the allegedly retaliatory action. With a material factual dispute as to Hernandez's knowledge of Plaintiff's complaint and the timing of the adverse action, Plaintiff has satisfied the third prong of the analysis.

Defendants argue that there is no evidence that Hernandez's actions chilled Plaintiff's exercise of his First Amendment rights (Doc. 52 at 8); however, Plaintiff need not demonstrate a total chilling of his rights to support his retaliation claim. Rhodes, 408 F.3d at 568-69. That Plaintiff's First Amendment rights were chilled, though not necessarily silenced, is enough. Id. at 569. Plaintiff avers that he believed that Hernandez retaliated against him, and he consequently lost his job due to his complaint to the Sergeant (Doc. 55, Ex. 1, Pl. Decl. ¶¶ 5-6). This is sufficient to show a chilling effect on Plaintiff's First Amendment rights.

Lastly, Plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains. Pratt, 65 F.3d at 806 (citations omitted). Plaintiff must show that Hernandez did not have a legitimate correctional purpose in bringing her accusation against Plaintiff to his supervisor and the WIPP Coordinator.

Rhodes, 408 F.3d at 568.  As mentioned, the Court must "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory."  Pratt, 65 F.3d at 807 (quotation omitted).

Defendants argue that under Department Order (DO) 501.02, which governs employee professionalism, ethics, and conduct, Hernandez is required to take corrective action in response to all inmate rule violations to ensure impartiality and fairness with all inmates (Doc. 53, Ex. B, Ex. 5, DO 502.02 § 1.1.5).  Hernandez asserts her belief that Plaintiff had improperly used the printer; therefore, given her obligation to take corrective action, she brought her suspicions about Plaintiff's use of the school printer to his supervisor (id., Ex. B, Hernandez Decl. ¶ 7).  In his declaration, Ard, Plaintiff's supervisor, states that he also suspected that Plaintiff had used the computer and printer for personal work and that he requested to the WIPP Coordinator that Plaintiff be reassigned from his position (Doc. 53, Ex. G, Ard. Decl. ¶ 6).  After Ard relayed his suspicions to the WIPP Coordinator, Plaintiff was terminated from his position (id., Ex. C, Huggins Decl. ¶¶ 9-10).  This evidence shows that in going to the work supervisor and WIPP Coordinator, Hernandez was acting pursuant to policy and that her charge that Plaintiff violated computer-usage rules was supported; thus, her actions served a legitimate penological purpose.

Plaintiff's only response to this evidence is his claims that Ard assured Huggins that Plaintiff did not have access to computers and that Ard tried to reinstate Plaintiff to his Teaching Aide position (Doc. 55, Ex. 1, Pl. Decl. ¶¶ 10-11).  But Plaintiff's claims are unsupported by personal knowledge or other evidence and they are contrary to Ard's own sworn statement.   As such, Plaintiff's claims are insufficient to create a material factual dispute.  See Leer, 844 F.2d at 634.

In short, Plaintiff fails to establish that there was not a legitimate penological purpose for Hernandez's conduct when she went to Plaintiff's work supervisor and the WIPP coordinator.  For this reason, summary judgment will be granted to Hernandez on the retaliation claim in Count I, and Plaintiff's request for summary judgment on this claim will be denied.

## 2. Huggins

The Court already determined that Plaintiff's complaint to the Sergeant about Hernandez constituted protected conduct.  Plaintiff also avers that after Huggins terminated him from his Teaching Aide position and reassigned him to inappropriate jobs, he complained about Huggins to CO IV Perry (Doc. 55, Ex. 1, Pl. Decl. ¶¶ 13, 15, 17). Plaintiff's additional oral complaints about Huggins also amount to protected conduct.

Plaintiff asserts that Huggins terminated him from his Teaching Aide job, assigned him to menial jobs that were inappropriate given Plaintiff's disability, and—after Plaintiff's transfer—worked to get Plaintiff terminated from his second Teaching Aide position (Doc. 55, Pl. Decl. ¶¶ 13, 15-16, 35).  Huggins' alleged actions constitute an adverse action.

Again, to show that Huggins' adverse action was "because of" his protected conduct, Plaintiff must first demonstrate that Huggins knew of the protected conduct.  Corales, 567 F.3d at 568.  Defendants assert that Huggins was not aware that Plaintiff complained about her (Doc. 52 at 10).  There is no evidence that Huggins spoke to the Security Sergeant to whom Plaintiff brought his complaint about Hernandez, nor is there evidence that Huggins spoke with CO IV Perry, to whom Plaintiff made complaints about Huggins.  In his response, Plaintiff does not directly respond to Huggins' averment that she was not aware that Plaintiff had complained about her (Doc. 53, Ex. C, Huggins Decl. ¶ 21).  Although some of the declarations submitted by Plaintiff reference generally his complaints and grievances against staff (Doc. 55, Ex. 2, Shahid Decl. ¶ 27; Ex. 3, Randy C. Milliner Decl. ¶¶ 8-9), and one other inmate avers that he also complained about Huggins to CO IV Perry (id., Ex. 4, Maffi Arsalan Decl. ¶ 7), there is no evidence or allegation to establish that Huggins was put on notice of any of Plaintiff's complaints or grievances.

Because Plaintiff submits no probative evidence establishing that Huggins knew of his protected conduct, there exists no genuine issue of material fact on this element of the retaliation claim, and the Court need not proceed with the remainder of the Rhodes analysis. Summary judgment will be granted to Huggins on Plaintiff's retaliation claim in Count I, and summary judgment will be denied to Plaintiff.

### 3. Turner

With respect to Turner, the first element in the <u>Rhodes</u> analysis is satisfied by evidence that Plaintiff complained to Administration about Turner and that on May 19, 2010, he filed two informal grievances against Turner, which is protected conduct (Doc. 55, Ex. 1, Pl. Decl. ¶ 23; Ex. 2, Shahid Decl. ¶ 18[17]).

The alleged adverse action is Turner's attempts to get Plaintiff moved from Yard 1 to Yard 2 and later to Florence East.  Courts have recognized that some transfers, or even the mere threat of a transfer, may be considered adverse actions.  <u>See Brodheim</u>, 584 F.3d at 1269-70; <u>Rhodes</u>, 408 F.3d at 568 (initiation of a prison transfer and destruction of property in retaliation for filing grievances); <u>Pratt</u>, 65 F.3d at 805-06 (prison transfer and double-cell status in retaliation); <u>Rizzo</u>, 778 F.2d at 530-32 (retaliatory reassignment out of vocational class and transfer to a different facility).

The only evidence that Turner may have been involved in Plaintiff's transfers is the statement by Shahid that, on May 19, 2010, Turner said to him that she knew Plaintiff complained about her, that Plaintiff "doesn't know who he is messing with," and that she went with Huggins to Movement Control to try to get Plaintiff moved off of Yard 1 and that he would be moved that afternoon (Doc. 55, Ex. 2, Shahid Decl. ¶ 19).  Defendants argue that, as a CO III, Turner had no authority to transfer an inmate and that only a Deputy Warden or his or her designee could have an inmate moved (Doc. 53, Ex.  D, Turner Decl. ¶ 8).  This does not necessarily preclude Turner's liability for retaliation.  <u>See Gilbrook v. City of Westminster</u>, 177 F.3d 839, 854-55 (9th Cir. 1999) (subordinate can be held liable for retaliation, even where final decisionmaker's determination was not retaliatory, if subordinate's "improper motive sets in motion the events that lead to [adverse action] that would not otherwise occur") (citation and emphasis omitted).  However, the evidence does not support that it was Turner's motive or actions that led to Plaintiff's transfers.

---

[17]Defendants object to ¶ 18 of Shahid's declaration on the grounds that the statement simply sets forth Shahid's feelings or conclusions and is not relevant (Doc. 71 at 4).  The objection is overruled.  In ¶ 18, Shahid testifies as to what he personally observed on May 19, 2010, and what he observed is relevant to Plaintiff's retaliation claim against Turner.

The record reflects that on May 13, 2010, Plaintiff was reassigned to a groundskeeper position and this reassignment led to his transfer from Yard 1 to Yard 2 on May 19, 2010 (Doc. 53, Ex. C, Huggins Decl. ¶ 13).   Thus, Plaintiff's transfer to Yard 2 was already planned pursuant to the job reassignment when, on May 19, 2010, Plaintiff filed his informal grievances against Turner.  As such, there is no evidence that his informal grievances had any effect on the decision to move Plaintiff to Yard 2.

Plaintiff submits no evidence connecting Turner to his July 8, 2010 transfer to Florence East.   The record shows that Turner did not have authority to effect an inmate transfer, and Plaintiff does not allege that Turner went to the Deputy Warden or took some other affirmative steps to attempt to get Plaintiff moved (Doc. 52 at 12; Doc. 53, DSOF ¶¶ 38-39).  Plaintiff alleged in his Complaint that on July 8, 2010, he "was severely retaliated against by getting transferred to Florence-East . . . ," but he does not tie the transfer to any specific Defendant (Doc. 1 at 3B).  And in his response, Plaintiff states that around July 8, 2010, Turner retaliated against him, and Plaintiff was moved to Florence East (Doc. 55, Ex. 1, Pl. Decl. ¶ 34).  These general and conclusory assertions are insufficient to establish a material factual dispute whether Turner had a role in Plaintiff's transfer.  See Leer, 844 F.2d at 634 ("the prisoner must establish individual fault," and "[s]weeping conclusory allegations will not suffice to prevent summary judgment"); Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986).

Because Plaintiff submits no probative evidence establishing that Turner personally took an adverse action against Plaintiff, there exists no genuine issue of material fact on this element of the retaliation claim.  Accordingly, the analysis ends, and summary judgment will be granted to Turner on the retaliation claim in Count I, and Plaintiff's request for summary judgment on this claim will be denied.

**IV.    Count III-Shaving Waiver**

Plaintiff asserts both a free-exercise claim and equal protection claim related to the denial of shaving waiver.

**A.    Facts**

When Plaintiff entered the ADC in December 2009, he designated his religious preference as Muslim (Doc. 53, DSOF ¶ 55). Plaintiff applied for a religious shaving wavier, and, on January 7, 2010, Brier interviewed Plaintiff regarding this request (id. ¶ 57; Doc. 1 at 5; Doc. 55, Ex. 1, Pl. Decl. ¶ 42 (in part)). Defendants state that on January 27, 2010, Brier presented his interview results to Senior Chaplain Becker and requested direction on how to proceed (DSOF ¶ 58). Defendants state that Becker advised further information was needed to aid in the determination of Plaintiff's beliefs; specifically, what in Islam shows that a beard is a tenet of Plaintiff's faith and how does Plaintiff know this (id. ¶ 59).

Defendants state that after his meeting with Becker, Briar was approached by Plaintiff, and Brier advised him of the information requested by Becker (id. ¶ 60). Defendants state that Plaintiff told Brier that it was commanded by the prophet for him not to shave and that he would look for written material to this effect (id.). Defendants state that Brier advised Plaintiff that until he provided this information, it would be difficult to go forward in the process (id.).

Plaintiff states that he repeatedly inquired to Brier about the requested shaving waiver, to which Brier responded that they were still evaluating the request (Doc. 55, Ex. 1, Pl. Decl. ¶ 43[18]). Defendants state that Brier spoke with Plaintiff several times over the next few weeks and reminded him that the additional information was needed; Defendants state that Plaintiff merely responded that it was a command of the prophet (DSOF ¶ 61).

Plaintiff states that in April 2010, Brier told him his waiver application was lost and he needed to come in for another interview, which Plaintiff did (Doc. 55, Ex. 1, Pl. Decl. ¶ 45[19]). Plaintiff states that at this interview, he resubmitted proof in support of the waiver (id.). Defendants state that in April 2010, Plaintiff appeared at Brier's office and pressed him about the shaving waiver (DSOF ¶ 62). Defendants state that Brier advised Plaintiff of the

---

[18]Defendants object to ¶ 43 on the ground that it lacks foundation and is not supported by admissible evidence (Doc. 71 at 12). The objection is overruled. Plaintiff has personal knowledge of what he asked Brier and what Brier told him. See n. 8.

[19]Defendants object to ¶ 45 on the ground that it lacks foundation and is not supported by admissible evidence. The objection is overruled. See n. 8.

needed information and that because it had been four months since the process was started and Plaintiff had not completed the interview, Brier was closing out the request until Plaintiff provided the additional information (id.).

On July 21, 2010, Brier issued an "Inmate Letter" to Plaintiff stating that based on an interview and a review of other information, his office "cannot currently identify a sincere religious reason for your request that is consistent with your declared religious preference" (Doc. 55, Ex. 11; Doc. 70, Ex. A, Ex. 1).

## B. Free Exercise Claim

### 1. Legal Standard

The First Amendment provides that the government shall not prohibit the free exercise of religion.   U.S. Const. Amend. I.   Prisoners must therefore be afforded reasonable opportunities to exercise their religious freedom.   Cruz v. Beto, 405 U.S. 319, 322 n. 2 (1972).   Nevertheless, free-exercise rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security."   O'Lone v. Shabazz, 482 U.S. 342, 348 (1987).

To establish a First Amendment free-exercise violation, a plaintiff must first show that the religious practice at issue concerns a sincerely held belief and that the claim is rooted in religious belief.   Malik v. Brown, 16 F.3d 330, 333 (9th Cir. 1994) (internal citations omitted); see Shakur v. Schriro, 514 F.3d 878, 884-85 (9th Cir. 2008).   The plaintiff must then demonstrate a burden to his sincerely held belief.   See Shakur, 514 F.3d at 884.   To substantially burden the practice of an individual's religion, the interference must be more than an isolated incident or short-term occurrence.   See Canell v. Lightner, 143 F.3d 1210, 1215 (9th Cir. 1998).   Prison official's negligent or accidental actions that impinge on an inmate's religious practice are insufficient to support a First Amendment claim.   See Lovelace v. Lee, 472 F.3d 174, 194 (4th Cir. 2006).

Finally, if the regulation or conduct at issue impinges on the plaintiff's constitutional rights, it is valid if it is reasonably related to legitimate penological interests.   Turner v. Safley, 482 U.S. 78, 89 (1987).   Turner sets out four factors to be balanced to determine

whether a regulation is reasonable: (1) whether there is a "valid, rational connection" between the action or regulation and the "legitimate governmental interest put forward to justify it"; (2) whether there are "alternative means of exercising the right that remain open to prison inmates"; (3) whether "accommodation of the asserted constitutional right" will "impact . . . guards and other inmates, and [ ] the allocation of prison resources generally"; and (4) whether there is an "absence of ready alternatives" versus the "existence of obvious, easy alternatives." Id. at 89-90.

### 2. Analysis

The first step in the free-exercise analysis requires Plaintiff to show that he sincerely believes that keeping a beard is consistent with his Muslim faith. See Shakur, 514 F.3d at 884-85 (the plaintiff need not show that the religious practice at issue is required as a central tenet of the religion, only that he believes that the practice is consistent with his faith). Plaintiff avers that he was born Muslim and is a practicing Muslim, and he refers to verses from the Quran and Hadith that he believes establish that keeping a beard is one of the tenets in Islam (Doc. 55 at 5, 12). This is sufficient to show a sincerely held belief, and the prison's refusal to provide a shaving waiver therefore implicates the Free Exercise Clause. See Shakur, 514 F.3d at 885.

Next, Plaintiff must demonstrate that Brier's actions burdened his sincerely held belief. See id. at 884. Defendants' first argument on this element is that Plaintiff was not burdened during the relevant period because he continued to grow his beard (Doc. 52 at 15). But Plaintiff denies that he said he was going to grow his beard until forced to shave it (Doc. 55, Ex. 1, Pl. Decl. ¶ 47[20]). Notably, Defendants do not refute Plaintiff's claim that ADC

---

[20]Defendants object to ¶ 47 of Plaintiff's declaration on the ground that it includes argument (Doc. 71 at 13). The objection is overruled. Plaintiff has personal knowledge as to what he said and did not say to Brier. Fed. R. Civ. P. 56(c)(4). That Plaintiff began ¶ 47 with the words "[c]ontrary to Defendants' false statement," does not render his subsequent averment about what he told Brier "argumentative." See Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (discussing why many objections raised at summary judgment are unnecessary and not useful, such as objections to argumentative statements—argumentative statements in a declaration are not facts and are not considered

rules prohibit inmates from growing a beard beyond two days. Instead, they argue that there is no evidence that ADC staff actually forced Plaintiff to cut his beard (Doc. 71 at 27). Even if ADC did not enforce its grooming rule that required Plaintiff to cut his beard, that the rule existed meant the Plaintiff would risk a rule violation by growing his beard without a waiver. Such a rule puts significant pressure on an inmate to cut his beard; thus, it burdens the religious practice of an inmate like Plaintiff who sincerely believed that keeping a beard was consistent with his faith. See Warsoldier v. Woodford, 418 F.3d 989, 994, 996 (9th Cir. 2005).

Defendants next argue that Brier is not personally responsible for burdening Plaintiff's religious exercise because he did not have the authority to approve a waiver and he handled Plaintiff's waiver request appropriately (Doc. 52 at 15; Doc. 71 at 27). The evidence reflects that only the Senior Chaplain and the Administrator of Pastoral Services have authority to approve a religious shaving waiver (Doc. 53, Ex. K, Becker Decl. ¶ 11). According to Brier's declaration, as a Correctional Chaplain at the Florence Complex, he was the official who interviewed the inmate and obtained the information necessary for presentation to the Senior Chaplain, who then approved or denied the waiver request (id., Ex. E, Brier Decl. ¶¶ 1, 7-13). It is reasonable to infer that Brier's actions determined when the Senior Chaplain received the waiver request and accompanying information and, thus, Brier could affect the time it would take for a final decision.

The record reflects that on January 27, 2010, Brier presented the results of Plaintiff's January 7, 2010 interview to Senior Chaplain Becker (id., Ex. E, Brier Decl. ¶¶ 7-8). Brier avers that Becker advised him to obtain further information from Plaintiff to support that a beard is a tenet of Islam (id. ¶ 9). The parties dispute whether, thereafter, Brier repeatedly told Plaintiff that they were still evaluating the request—as Plaintiff alleges—or Brier kept reminding Plaintiff that he had to provide additional information—as Defendants claim (id. ¶¶ 61-62; Doc. 55, Ex. 1, Pl. Decl. ¶¶ 43, 45).

---

at summary judgment, and objections on this ground "are simply superfluous in this context").

The evidence shows, however, that Plaintiff received a notice in writing from Brier on April 23, 2010, stating that he failed to supply "in depth information as to what, exactly, your religious reasons are for your claim that you must have a [s]having waiver. Until you do[,] you have not completed the process" (Doc. 53, Ex. E, Ex. 3). It is not clear from the record whether Plaintiff received this notice before or after his meeting that same day with Brier (see id., Brier Decl. ¶ 12). If the notice was issued prior to their meeting, it would explain why Plaintiff went to Brier's office that same day to inquire about the waiver request, as Brier avers (id.). The parties dispute what transpired at this meeting; Defendants state that Brier advised Plaintiff that more information was needed and that he was "closing out the request" until Plaintiff provided the information, and Plaintiff states that he submitted to another interview for a shaving waiver and resubmitted documents (id.; Doc. 55, Ex. 1, Pl. Decl. ¶ 45). Brier states that he documented this meeting on a Chaplain/Inmate Interview Worksheet (Doc. 53, Ex. E, Brier Decl. ¶ 12). This Worksheet is the exact same form used at Plaintiff's January 7 interview, and it does not document that Brier gave Plaintiff any advisements nor does it indicate that Brier was closing out the request; rather, it includes Plaintiff's responses to questions about his faith and includes a request for a shaving wavier (id., Ex. 3). Thus, on its face, the April 23, 2010 Worksheet supports Plaintiff's claim that he submitted to a second interview for a shaving waiver. On Defendants' motion, when making all inferences in Plaintiff's favor, he was not told that he had to submit more information until he received the April 23, 2010 notice, at which time he went to Brier's office and underwent another interview for a shaving waiver. Plaintiff further alleges that Brier continued to "give him the run around" until his July 2010 transfer to Florence East (Doc. 55 at 6, 12).

On this record, there are disputed material facts whether Brier waited from January until April 23, 2010, to communicate to Plaintiff his need to provide further information in support of his shaving waiver request. Further, there is no evidence that Brier re-presented Plaintiff's waiver request to Senior Chaplain Becker following the April 23, 2010 meeting. In his declaration, Becker avers that Brier presented to him the results of the January 7, 2010

interview with Plaintiff, but he does not indicate that Brier presented any information to him thereafter (Doc. 53, Ex. K, Becker Decl. ¶¶ 9-10 (Doc. 53-2 at 70)).  Nor does Becker state that he ever made the determination to deny Plaintiff the waiver (see id.).  Indeed, Defendants confirm that Plaintiff's waiver request "never reached the evaluation stage" (Doc. 52 at 15).

The record shows that in July 2010, Brier issued a notice to Plaintiff effectively denying the shaving waiver on the ground that Plaintiff could not present a sincere religious reason for his request.  As Defendants assert, only Becker had the authority to make such a determination (Doc. 53, Ex. K, Becker Decl. ¶¶ 9-10 (Doc. 53-2 at 70)).  A reasonable jury could find that Brier's actions either prevented a decision on Plaintiff's religious shaving waiver request or amounted to a denial of the waiver request.  As such, there exists a genuine issue of material fact whether Brier's conduct burdened Plaintiff's religious practice.

The Court must proceed to the final step in the analysis, which considers whether the denial of a shaving waiver is reasonably related to legitimate penological interests and therefore valid.  Turner, 482 U.S. 78, 89 (1987).  But here, because they summarily conclude that Plaintiff's religious practice was not burdened, Defendants fail to address any of the Turner factors.  As a result, they fail to satisfy their summary judgment burden on this element, and material factual disputes remain as to the Count III free-exercise claim against Brier.  See Greene v. Solano Cnty. Jail, 513 F.3d 982, 990 (9th Cir. 2008) (a pro se litigant "cannot be expected to anticipate and prospectively oppose arguments that an opposing defendant does not make"; thus, sua sponte grant of summary judgment inappropriate on claim the defendant failed to address in motion).  Defendants' request for summary judgment on this claim will be denied, and, in light of the material factual disputes, Plaintiff's request for summary judgment on this claim will also be denied.

### C.   Equal Protection Claim

#### 1. Legal Standard

The Equal Protection Clause requires the State to treat all similarly situated people equally, and ensures that prison officials cannot discriminate against particular religions.  See

City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  Specifically, the Equal Protection Clause entitles each prisoner to "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts."  Cruz, 405 U.S. at 322 (providing that Buddhist prisoners must be given opportunity to pursue faith comparable to that given Christian prisoners).  But this does not require that prisons duplicate every religious benefit provided so that all religions are treated exactly the same, nor must prisons provide identical facilities or personnel to different faiths. Rather, the Equal Protection Clause requires prison officials to make a "good faith accommodations of the prisoner's rights in light of practical considerations."  Allen v. Toombs, 827 F.2d 563, 569 (9th Cir. 1987).

The United States Supreme Court has held that "showing that different persons are treated differently is not enough without more, to show a denial of Equal Protection."  Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty., 377 U.S. 218, 230 (1964).  Rather, a plaintiff must demonstrate that "the defendants acted with an intent or purpose to discriminate against [him] based upon membership in a protected class."  See Thornton v. City of St. Helens, 425 F.3d 1158, 1166 (9th Cir. 2005). In other words, he must show that he was treated differently because he belonged to a protected class.

. . .

## 2. Analysis

Plaintiff alleges that he was treated differently that other similarly situations prisoners. He states that Rastafarian prisoners were allowed to keep their beards and Native Americans were allowed to keep long hair for religious reasons; however, Brier did not permit Plaintiff and other Muslims to keep their beards (Doc. 55 at 13). In reply, Defendants contend that there is no evidence regarding the procedures followed by these other prisoners who were allegedly permitted to have a beard or long hair and that they may have provided the necessary information to obtain a religious waiver; something Defendants claim Plaintiff failed to do (Doc. 71 at 31).

Although there exists a genuine issue of material fact regarding whether Plaintiff provided the necessary information and Brier unlawfully delayed or denied the shaving waiver request, the Court notes that the only evidence that would tend to prove this denial stemmed from an intent to discriminate is Plaintiff's bare allegation. The Court is not obligated to accept as true "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). Plaintiff does not set forth any facts pertaining to Brier's motivation for denying the waiver request, nor does he allege any specific conduct by Brier that would suggest discriminatory animus, such as derogatory comments about Muslims. Plaintiff proffers declarations from four other prisoners who identify themselves as fellow Muslims (Doc. 55, Ex. 2, Shahid Decl. ¶ 7; Ex. 3, Randy C. Milliner Decl. ¶¶ 6, 18; Ex. 6, Donald Portis Decl. ¶ 6; Ex. 7, Shawn Carmouche Decl. ¶ 7 (Doc. 55 at 29-35, 42-46)). None of these declarants state that they were denied or delayed shaving waivers (see id.). Moreover, Plaintiff fails to identify any specific Rastafarian or Native American prisoner who was similarly situated but granted a shaving waiver.

In short, Plaintiff's allegations that Brier's conduct was discriminatory and that Plaintiff was treated differently than other similarly situations inmates, without more, are insufficient to support a claim of intentional discrimination. Defendants' request for

summary judgment on the equal protection claim in Count III will be granted, and Plaintiff's request for summary judgment on this claim will be denied.

## V.    Count IV-Quran

### A.    Facts

There is no dispute that in December 2009, the Florence Complex Chaplaincy received a box of Arabic language books and copies of the Quran (DSOF ¶ 74; Doc. 55, Ex. 1, Pl. Decl. ¶ 50 (Doc. 55 at 25[21]).  Senior Chaplain Becker states he spoke to the donor—whom he does not identify—and explained that under ADC policy, religious items can be donated to the Department for use in group worship but cannot be donated to a specific inmate (Doc. 53, Ex. K, Becker Decl. ¶¶ 6-7 (Doc. 53-2 at 70)).  The parties dispute whether the box of books was donated to a specific inmate; however, neither party demonstrates personal knowledge of the addressee, nor does either party submit a copy of the invoice or any documentary evidence to establish to whom the books were sent (see id. 6; Ex. E, Brier Decl. ¶ 4 (Doc. 53-1 at 56-57); Doc. 55, Pl. Decl. ¶¶ 50-51[22]).  Becker states that the donor requested that the books be returned (Doc. 53, Ex. K, Becker Decl. ¶ 7).

Plaintiff states that Brier refused to accept the books for almost seven months, during which time Brier told him that they were still evaluating the books (Doc. 55, Ex. 1, Pl. Decl. ¶ 52[23]).  Plaintiff states that from December 2009 to July 2010, Brier repeatedly asked

---

[21]Defendants object to ¶ 50 of Plaintiff's declaration on the ground that it lacks foundation and is not supported by admissible evidence (Doc. 71 at 13).  The objection is overruled.  Defendants concede that a box of Arabic language books was received by the prison facility in December 2009, and they do not dispute that the books included copies of the Quran.  The record also includes a prison official's response to Plaintiff's Inmate Letter regarding this complaint, and the response refers to a box of Holy Qurans (Doc. 22, Ex. 26 (Doc. 22-2 at 81)).  See Fed. R. Civ. P. 56(c) (court may consider any materials in the record).

[22]Defendants' objection to ¶ 51 of Plaintiff's declaration is sustained as explained in the body (Doc. 71 at 13).

[23]Defendants object to ¶ 52 of Plaintiff's declaration on the ground that it lacks foundation and is not supported by admissible evidence (Doc. 71 at 13).  The objection is overruled.  Plaintiff has personal knowledge as to what Brier told him about the books.  Fed.

Plaintiff for information about the sender and the intended use of the Qurans, which Plaintiff provided (Doc. 1 at 5A).  Plaintiff alleges that during this time, Brier provided holy books of other faiths without delay (id.).  Plaintiff states that at one point, Brier offered him a copy of the Bible instead of the Quran (Doc. 55, Ex. 1, Pl. Decl. ¶ 55[24]).  Brier disputes that he offered Plaintiff a Bible instead of a Quran (Doc. 70, Ex. A, Brier Supp. Decl. ¶ 6 (Doc. 70 at 6)).

Plaintiff avers that after seven months, the box with Arabic Language books was accepted but the box with copies of the Quran was returned to the sender (Doc. 55, Ex. 1, Pl. Decl. ¶ 54[25]).  In a supplemental declaration, Becker confirms that he accepted a box of Arabic language books and instructed Brier to keep the books in Brier's office and allow inmates to check out the books for review in the office (Doc. 70, Ex. B, Beck Supp. Decl. ¶ 3 (Doc. 70 at 10-11)).

### B.   First Amendment Claim

#### 1. Legal Standard

The legal standard governing free-exercise claims is set forth above.

#### 2. Analysis

Defendants do not challenge whether Plaintiff has a sincere belief that having a copy of the Quran is necessary for the free exercise of his religion (see Doc. 52 at 15).  Plaintiff has already presented his sincerely held Muslim beliefs, and a refusal to provide a copy of his religion's text, the Quran, implicates the Free Exercise Clause.  See Shakur, 514 F.3d at 885.

---

R. Civ. P. 56(c)(4).  See n. 8.

[24]Defendants' objection to ¶ 55 of Plaintiff's declaration is overruled (Doc. 71 at 13). Plaintiff has personal knowledge to attest that Brier offered him a Bible.  See n. 8.

[25]Defendants' objection to ¶ 54 of Plaintiff's declaration is overruled (Doc. 71 at 13). Defendants' own evidence supports Plaintiff's averment—that the box of Arabic language books was accepted and the box of Qurans was returned to sender (see Doc. 70, Ex. B, Becker Supp. Decl. 3; Doc. 53, DSOF 76 (Doc. 53 at 14)).

As discussed above, the next step requires a showing that Brier's actions burdened Plaintiff's sincerely held belief.  See id. at 884.  Defendants maintain that Brier could not have burdened Plaintiff's religious practice because he was not personally involved in the alleged violation (Doc. 52 at 16; Doc. 71 at 28).  Liability under a § 1983 claim arises "only upon a showing of personal participation by the defendant."  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.1989) (citation omitted).  Therefore, Plaintiff must allege facts that show Brier was personally involved in the deprivation of his civil rights.  Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998).  The personal-involvement inquiry "must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  Leer, 844 F.2d at 633.

Defendants' evidence establishes that Senior Chaplain Becker was the individual authorized to accept books donated to the Florence prison complex (Doc. 70, Ex. B, Becker Supp. Decl. ¶ 3).  Becker was the person who spoke to the donor, who accepted only the Arabic language books and not the Qurans, and who instructed Brier as to how to make the language books available to inmates (id.; Doc. 53, Ex. K, Becker Decl. ¶ 7).  Despite some evidentiary deficiencies,[26] the record is sufficient to demonstrate that it was Becker's, not Brier's, responsibility to accept or refuse the books.  See Leer, 844 F.3d at 633.  And, unlike the claim related to the shaving waiver, there is no evidence that Brier prevented Becker from making the decision whether to accept the Qurans or that Brier's actions effectively constituted a denial of the books.

On this record, there exists no genuine issue of material fact to support that Brier personally burdened Plaintiff's religious practice by rejecting donated copies of the Quran.  This ends the First Amendment analysis, and Defendants' request for summary judgment on this First Amendment claim in Count IV will be granted, and Plaintiff's request for judgment on this claim will be denied.

[26]For example, Defendants state that books donated to an individual inmate are not permitted by policy; however, they do not cite to any policy to support this statement, and the record shows that Becker accepted the Arabic language books that were allegedly donated to an individual inmate (see Doc. 53, Ex. K, Becker Decl. ¶¶ 6-7 (Doc. 53-2 at 70)).

### C.    Equal Protection Claim

#### 1. Legal Standard

The legal standard governing equal protection claims is set forth above.

#### 2. Analysis

As discussed above, liability requires a showing of personal participation by the defendant.  Taylor, 880 F.2d at 1045.  The Court has already determined that there is no evidence Brier was personally involved in refusing and returning the box of Qurans sent to the Florence complex.  It follows that absent personal involvement, he cannot be liable for the equal protection claim arising from the same set of facts.  Accordingly, summary judgment will be granted to Defendants on the equal protection claim in Count IV, and judgment will be denied to Plaintiff.

### VI.    Count VI-Communal Prayer

#### 1. Facts

Plaintiff's Count VI claim arose during the month of Ramadan in 2010, which occurred from August 11 to September 9 (Doc. 1 at 5C; Doc. 53, DSOF ¶ 79).  Muslims observing Ramadan eat their breakfast meal before sunrise and their dinner meal after sunset (DSOF ¶ 80).  On July 20, 2010, the Chaplain issued a memorandum stating that during Ramadan, "[w]hile there is a requirement for prayer prior to eating, it is not required to be communal prayer.  It is suggested that 20-30 minutes be given for eating in the dining halls to allow inmates to pray, if they choose, while in the dining hall" (id. ¶ 82).  During the relevant time, Riharb worked the graveyard shift, from 10 p.m. to 6 a.m., during which time she attended the chow hall breakfast turn out (Id. ¶¶ 83-84).

Plaintiff states that during Ramadan, he and approximately 20 other Muslim inmates were entering the dining hall in the early morning hours to pray when Riharb shouted to them "take back your rags"—a derogatory reference to the prayer rugs the inmates were holding (Doc. 55, Pl. Decl. ¶¶ 56-57).  Plaintiff states that he informed Riharb that they needed their prayer rugs to pray and cannot otherwise perform their prayers on the floor; however, Riharb ordered them to take them back to their cells (id. ¶ 58).  Plaintiff states that he filed a

grievance and spoke to a Sergeant about Riharb's conduct, who assured Plaintiff that staff would be notified of inmates' right to take their prayer rugs into the chow hall (id. ¶ 60). Plaintiff states that the following week, Riharb again ordered Muslim inmates to take back their rugs and Plaintiff again brought a grievance to the administration (id. ¶ 61).  Plaintiff states that the third time Riharb took the same action, inmates challenged her as a group, after which she spoke to the Sergeant and then finally allowed them to bring in their prayer rugs and pray (id. ¶¶ 62-63).

Defendants state that inmates were permitted to bring their individual prayer rugs for prayers in the chow hall (DSOF ¶ 85).  Defendants state that on one or two occasions at breakfast during Ramadan in 2010, several Muslim inmates tried to bring in sheets to be used as prayer rugs, which was not permitted, and Riharb instructed them to return their sheets to their cells (id. ¶ 90).  Defendants state that Riharb never prevented Plaintiff from praying at breakfast meals during Ramadan (id. ¶ 92).

### 2.  Legal Standard

The legal standard governing a First Amendment free-exercise claim is presented above.

### 3.  Analysis

Defendants argue that communal prayer during Ramadan has not been established as an Islamic tenet and that the Chaplain never approved a communal prayer during Ramadan for Muslim inmates (Doc. 52 at 18).  But in the first step of the free-exercise analysis, Plaintiff is not required to show that communal prayer during Ramadan is a central tenet of the Muslim religion or that the practice was officially approved by the Chaplain; he need only show that the practice is consistent with his faith.  See Shakur, 514 F.3d at 884-85. Plaintiff expressed his personal belief that communal prayer was a central tenet of his religion (Doc. 1 at 5C).  Further, as he points out in his response, this claim is not strictly about communal prayer; he alleges that Riharb's actions prevented all Muslim inmates from exercising their basic right to pray (Doc. 55 at 14).  Indeed, Defendants acknowledge that during Ramadan, "there is a requirement for prayer prior to eating" (Doc. 53, DSOF ¶ 82).

The Court finds that Plaintiff has demonstrated his belief that conducting prayers with fellow Muslims prior to the morning meal during Ramadan is consistent with his faith.

Plaintiff must therefore demonstrate that Riharb's action burdened his sincerely held beliefs. See Shakur, 514 F.3d at 884. Plaintiff maintains that Riharb prevented inmates from taking their prayer rugs into the dining hall for prayers (Doc. 55 at 14). According to Plaintiff, no Muslims brought sheets instead of prayer rugs, and he argues that, even assuming, arguendo, that some did, it would not justify Riharb ordering all Muslim inmates to return their prayer rugs to their cells thereby prohibiting them from praying (id.).

Defendants maintain that Plaintiff nonetheless had the opportunity to pray in his cell (Doc. 52 at 19). But the Court has already found that Plaintiff expressed a sincere belief that communal prayers are consistent with his faith. Numerous courts addressing Muslim prisoners' rights have referred to the importance of communal prayer. See O'Lone, 482 U.S. at 352 (in upholding a prison regulation, Supreme Court noted that Muslims were able to observe a number of their religious obligations, including the right to congregate for prayer outside of work hours); Lovelace, 472 F.3d at 187 (relevant religious exercise was observing Ramadan and attending group prayer services); Williams v. Morton, 343 F.3d 212, 219 (3d Cir. 2003) (weekly congregational prayer service was valid avenue through which Muslim prisoners could express their religious beliefs); see also Cutter v. Wilkinson, 544 U.S. 709, 720 (2005) (in case involving prisoners of "nonmainstream" religions, noting that the "'exercise of religion' often involves . . . assembling with others for a worship service") (quotation omitted); Murphy v. Mo. Dep't of Corrs., 372 F.3d 979, 988 (8th Cir. 2004) (ban on communal worship may constitute a substantial burden under the Religious Land Use and Institutionalized Persons Act of 2000).

Defendants also maintain that the complained-of action occurred just once or twice (Doc. 53, DSOF ¶ 90). In his declaration, Plaintiff confirms that Riharb stopped Muslim inmates from bringing their prayer rugs into the dining room on just two occasions (Doc. 55, Ex. 1, Pl. Decl. ¶¶ 57-63). Intrusions that are "relatively short-term and sporadic" do not constitute a substantial interference. Canell, 143 F.3d at 1215 (finding that defendant

interfered with inmate's prayer activities on some occasions but it did not constitute a substantial burden and summary judgment was appropriate).  The Court finds that the denial of communal prayers on two mornings during the month of Ramadan does not amount to a substantial burden in violation of the First Amendment.  Consequently, Defendants request for summary judgment on Count VI will be granted, and Plaintiff's request for summary judgment will be denied.

**VII.    Qualified Immunity**

The only remaining claim is the Count III First Amendment free-exercise claim against Brier for the denial of a shaving waiver.  Defendants claim that Brier is entitled to qualified immunity (Doc. 52 at 23-25).

A defendant is entitled to qualified immunity if his or her conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The qualified-immunity analysis requires a court to address two questions: whether the facts alleged or shown by the plaintiff establish a constitutional violation and whether the right at issue was clearly established at the time.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Courts may decide which prong to address first depending on the circumstances of the case.  Pearson v. Callahan, 555 U.S. 223, 242-43 (2009).

Here, the Court has already determined that disputed facts, viewed in the light most favorable to Plaintiff, create triable issues of fact regarding whether Brier's actions violated Plaintiff's First Amendment free-exercise rights.  Thus, whether Brier is entitled to qualified immunity turns on whether the constitutional right at issue was clearly established such that he would have known that his conduct was unlawful.  See Saucier, 533 U.S. at 201.  "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right."  Hope v. Pelzer, 536 U.S. 730, 739 (2002).  However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be

apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citation omitted). "If the only reasonable conclusion from binding authority were that the disputed right existed, even if no case had specifically so declared, prison officials would be on notice of the right and would not be qualifiedly immune if they acted to offend it." Blueford v. Prunty, 108 F.3d 251, 255 (9th Cir. 1997). In other words, "'[c]losely analogous preexisting case law is not required to show that a right was clearly established.'" Sorrels v. McKee, 290 F.3d 965, 970 (9th Cir. 2002) (quotation omitted). Prison personnel "can still be on notice that their conduct violates established law even in novel factual circumstances." Hope, 536 U.S. at 741.

The Supreme Court long ago established that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 713-14 (1981). It was clearly established at the time Plaintiff's claim arose that the First Amendment protects a prisoner's sincere religious beliefs, not just central tenets of his faith, and that prison officials may not substantially burden inmates' right to the free exercise of their religion without some legitimate penological justification. See Shakur, 514 F.3d 883-85. In addition, case law existed to put Brier on notice that his alleged actions violated established law. See Warsoldier, 418 F.3d at 995 (finding inmate's religion was burdened by a grooming policy).

According to Defendants, Brier did not have authority to approve a shaving waiver, Plaintiff failed to provide the necessary information for the waiver, and he was not burdened because he continued to grow his beard (Doc. 52 at 23-24). Defendants conclude that in these circumstances, it would not be clear to Brier that his actions violated Plaintiff's constitutional rights (id. at 25).

This argument for qualified immunity rests entirely on Defendants' version of the facts, which Plaintiff disputes and which is an improper basis to support qualified immunity. See Conner v. Heiman, 672 F.3d 1126, 1131 (9th Cir. 2012) (a district court should decide qualified immunity only when the material facts are not in dispute); Wilkins v. City of Oakland, 350 F.3d 949, 956 (9th Cir. 2003) ("[w]here the [defendant's] entitlement to qualified immunity depends on the resolution of disputed issues of fact in [his or her] favor,

and against the non-moving party, summary judgment is not appropriate").  Defendants'
request for qualified immunity will therefore be denied.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for
Summary Judgment (Doc. 52) and Plaintiff's Motion for Summary Judgment (Doc. 55).

(2) Defendants' Motion for Summary Judgment (Doc. 52) is **granted in part** and
**denied in part** as follows:

> (a) the motion is **granted** as to the Count I First Amendment retaliation claims
> against Hernandez, Huggins, and Turner, and Count I is dismissed:
>
> (b) the motion is **granted** as to the Count III equal protection claim against
> Brier, and this claim within Count III is dismissed;
>
> (c) the motion is **granted** as to the Count IV First Amendment and equal
> protection claims against Brier, and Count IV is dismissed;
>
> (d) the motion is **granted** as to the Count VI First Amendment free-exercise
> claim against Riharb, and Count VI is dismissed; and
>
> (e) the motion is otherwise **denied**.

(3) Plaintiff's Motion for Summary Judgment (Doc. 55) is **denied**.

(4) Hernandez, Huggins, Turner, and Riharb are dismissed as Defendants.

(5) The sole remaining claim is the Count III First Amendment free-exercise claim
against Brier for the denial/delay of a religious shaving waiver.

DATED this 17th day of March, 2014.

Robert C. Broomfield
Senior United States District Judge